1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
10
11   JULIAN HILL,                    )      NO. CV 08-3240-PA (AGR)
12              Petitioner,          )
13         v.                        )
14   DIRECTOR, DEPARTMENT OF         )      REPORT AND
     CORRECTIONS,                    )      RECOMMENDATION OF UNITED
15                                   )      STATES MAGISTRATE JUDGE
16              Respondent.          )
17   _____  )
18         The Court submits this Report and Recommendation to the Honorable
19   Percy Anderson, United States District Judge, pursuant to 28 U.S.C. § 636 and
20   General Order No. 05-07 of the United States District Court for the Central District
21   of California.  For the reasons set forth below, the Magistrate Judge recommends
22   the Petition for Writ of Habeas Corpus be denied.
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

# I.

## SUMMARY OF PROCEEDINGS

On November 3, 2005, a Los Angeles County Superior Court convicted Petitioner of false imprisonment by violence.[1] (Petition at 2; Answer at 4.) On December 19, 2005, Petitioner was sentenced to 25 years to life under California's Three Strikes law. (*Id.*) On June 6, 2007, the California Court of Appeal affirmed Petitioner's conviction. (Lodged Document ("LD") 6.) On September 19, 2007, the California Supreme Court denied review without explanation. (LD 8.)

On May 15, 2008, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody in which he raised three grounds: (1) failure to instruct the jury on a lesser included offense; (2) denial of the right to an impartial jury; and (3) prosecutorial misconduct during closing argument. (Petition at 5-6 & Attached Brief.[2]) On October 14, 2008, Respondent filed an answer admitting timeliness and exhaustion. (Answer at 2.) On October 23, 2008, Petitioner filed a reply.

This matter was taken under submission and is now ready for decision.

# II.

## STATEMENT OF FACTS

Below are the facts set forth in the California Court of Appeal decision on direct review. To the extent an evaluation of Petitioner's claims for relief depends on an examination of the record, the Court has made an independent evaluation of the record specific to Petitioner's claims for relief.

---

[1] The jury hung on the counts of aggravated sexual assault of a child and lewd acts upon a child; those counts were later dismissed. (Answer at 4.)

[2] Petitioner attached his opening brief before the California Court of Appeal to his federal petition. For ease of reference, the Court will cite to the same document lodged by Respondent. (LD 3.)

2

On April 2, 2004, eleven-year-old R.G. attended an after-school program at a local school. R.G. asked Rene Alvarez, a staff member, for permission to use the faculty bathroom. The bathroom had one door, a single toilet, and a sink. R.G. stopped at the drinking fountain for water before entering the bathroom. There was no one in the bathroom when R.G. entered and closed the door behind her. At trial, R.G. could not remember whether she locked the bathroom door. After R.G. had used the bathroom, someone knocked on the door. R.G. responded, "'Hold on.'" Thereafter, defendant walked into the bathroom. Defendant locked the bathroom door by using the latch. R.G. heard a boy say, "'There's a man and a girl in the bathroom.'" Defendant said, "'I have to use the bathroom.'" Thereafter, R.G. said, "'Can I get out[?]'" Defendant responded, "'No.'" As R.G. attempted to leave, defendant closed the door. The door hit R.G.'s head and face. R.G. heard the janitor's keys as defendant attempted to lock the door. R.G. went to the corner of the bathroom. Defendant told her, "'Come here[.]'" After R.G. moved closer, defendant pulled down R.G.'s pants and underwear. R.G. began to scream. Defendant covered R.G.'s mouth and tried to kiss her. Defendant placed three fingers inside R.G.'s "private part." Defendant was in front of R.G. on his knees. R.G. was screaming and crying when defendant had his fingers in her privates. Defendant told R.G. to pull her pants up. R.G. also heard Mr. Alvarez's voice. Mr. Alvarez said, "'Open the door.'" About two minutes later, defendant told R.G. to shut up. Thereafter, defendant unlocked the door.

Once the door was open, R.G. walked out ahead of defendant and went to Maria Torres, a playground supervisor at the elementary school. R.G. began crying. R.G. said she was scared. R.G. then joined her friends, who took her to the school office. R.G. spoke to a female police officer later that afternoon. R.G. was examined at a hospital after she spoke to the police.

R.G. recalled her prior testimony that Mr. Alvarez had walked her to the bathroom. However, she was confused at that time because she had never been in a courtroom and was scared. R.G. still thought about what happened to her when defendant touched her. These thoughts made R.G. mad. R.G. also had nightmares about the incident.

Mr. Alvarez was a playground supervisor at a local school on April 2, 2004. Mr. Alvarez knew R.G. as an after school participant. Only the staff bathroom was available for use by those in the after school program. While supervising a group of children, Mr. Alvarez heard a scream and a door "shut hard." Mr. Alvarez testified the children said, "'There's a man just ran in with the little girl.'" Mr. Alvarez directed the other children to walk toward another playground supervisor. Mr. Alvarez knocked on the door and asked, "'Who's in there?'" No one answered. Mr. Alvarez attempted to open the door by turning the doorknob. However, someone pulled the door closed and locked it from inside. Mr. Alvarez hit the door hard and then called for other adults to assist. Ms. Torres and Mr. Tyson came to the restroom door. Ms. Torres said, "'Come out, come out, we need to know what is going on.'" Approximately four minutes had elapsed since Mr. Alvarez had first approached the restroom door.

Shortly thereafter, the door opened. R.G. ran out to Ms. Torres's arms. R.G. was crying. R.G. said, "'He touched me.'" Ms. Torres directed another girl to take R.G. to the office. Defendant came out of the restroom immediately after R.G. Defendant told Mr. Alvarez: "'She hurt her head. I was giving her medical assistance.'" Mr. Alvarez told defendant to remain at the school while the police were summoned. Defendant began walking in circles. Defendant realized Mr. Alvarez was calling the police on a cellular phone. Defendant then said: "'I didn't do nothing, you know. She hurt her head.'" Defendant then walked toward the parking lot. Mr. Alvarez and

4

other staff members followed him. They instructed defendant not to leave the school grounds. When the police arrived, defendant was approximately 70 yards from the school parking lot. Mr. Alvarez and the staff pointed defendant out to the police, who was immediately detained. Mr. Alvarez had never seen defendant before this incident. Although Mr. Alvarez did not unlock the bathroom door for R.G. on April 2, 2004, he may have on other occasions when it was inadvertently locked by other staff.

At 4 p.m. on April 2, 2004, Ms. Torres was supervising a group of children, including R.G. R.G. said she was going to the bathroom. Ms. Torres did not actually see R.G. enter the restroom. However, Mr. Alvarez later screamed, "'Maria, Maria.'" Mr. Alvarez was standing outside the staff bathroom. When Ms. Torres came to the bathroom, Mr. Alvarez was knocking on the door saying: "'Open the door. Who is in there.'" Mr. Alvarez told Ms. Torres that there was a man in the bathroom. Ms. Torres heard R.G. screaming. It sounded as though someone was covering R. G.'s mouth. When the restroom door finally opened, R.G. ran toward Ms. Torres. R.G. appeared to be frightened, was crying, and shook up. R.G. said defendant had touched her and hurt her head. Defendant came out of the restroom immediately thereafter. Ms. Torres gave instructions that R.G. should be taken to the school office. When Ms. Torres asked defendant what had happened, he became "very mad." Defendant repeatedly stated that he did not do anything.

Julie Lister was a nurse practitioner at the Violence Intervention Program at the University of Southern California medical center who testified for the prosecution. Ms. Lister was certified as a sexual assault nurse practitioner. Ms. Lister had performed in excess of 4,000 sexual assault examinations. Ms. Lister reviewed a videotape of the sexual assault examination performed on R.G. on April 2, 2004, as well as the Office of Criminal

1    Justice Planning report prepared in conjunction with that exam. Ms. Lister

2    formed the opinion that her findings differed from those of the examining

3    nurse. Ms. Lister believed that the superficial tear to the external part of

4    R.G.'s genital area occurred during the examination. Ms. Lister did not

5    observe any trauma or injuries to the genital or anal area. Ms. Lister noted

6    that even if fingers had been inserted in R.G.'s private part, there is usually

7    no trauma with such touching unless a finger is jabbed forcefully. In

8    addition, estrogen provides some protection from injury to the genital area.

9    There was no evidence of injury to R.G.'s hymen. In a hypothetical

10   situation where an individual kneels before a child and extends his three

11   fingers forward to her genital area, the fingers would not penetrate the

12   genital area. The contact would probably be external to the vaginal canal.

13   (LD 6 at 2-5 (footnote omitted).)

**III.**

**STANDARD OF REVIEW**

16         A federal court may not grant a petition for writ of habeas corpus by a

17   person in state custody with respect to any claim that was adjudicated on the

18   merits in state court unless it (1) "resulted in a decision that was contrary to, or

19   involved an unreasonable application of, clearly established Federal law, as

20   determined by the Supreme Court of the United States"; or (2) "resulted in a

21   decision that was based on an unreasonable determination of the facts in light of

22   the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d);

23   *Harrington v. Richter*, 131 S. Ct. 770, 784-85, 178 L. Ed. 2d 624 (2011) (citation

24   and quotation marks omitted).

25         "'[C]learly established Federal law' . . . is the governing legal principle or

26   principles set forth by the Supreme Court at the time the state court rendered its

27   decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed.

28   2d 144 (2003).  A state court's decision is "contrary to" clearly established

1   Federal law if (1) it applies a rule that contradicts governing Supreme Court law;

2   or (2) it "confronts a set of facts . . . materially indistinguishable" from a decision

3   of the Supreme Court but reaches a different result.  *Early v. Packer*, 537 U.S. 3,

4   8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).  A state court's decision cannot be

5   contrary to clearly established Federal law if there is a "lack of holdings from" the

6   Supreme Court on a particular issue.  *Carey v. Musladin*, 549 U.S. 70, 77, 127 S.

7   Ct. 649, 166 L. Ed. 2d 482 (2006).

8          Under the "unreasonable application prong" of section 2254(d)(1), a federal

9   court may grant habeas relief "based on the application of a governing legal

10  principle to a set of facts different from those of the case in which the principle

11  was announced."  *Lockyer*, 538 U.S. at 76; *see also Woodford*, 537 U.S. at 24-26

12  (state court decision "involves an unreasonable application" of clearly established

13  federal law if it identifies the correct governing Supreme Court law but

14  unreasonably applies the law to the facts).

15         A state court's decision "involves an unreasonable application of [Supreme

16  Court] precedent if the state court either unreasonably extends a legal principle . .

17  . to a new context where it should not apply, or unreasonably refuses to extend

18  that principle to a new context where it should apply."  *Williams v. Taylor*, 529

19  U.S. 362, 407, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

20         "In order for a federal court to find a state court's application of [Supreme

21  Court] precedent 'unreasonable,' the state court's decision must have been more

22  than incorrect or erroneous."  *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S. Ct.

23  2527, 156 L. Ed. 2d 471 (2003).  "The state court's application must have been

24  'objectively unreasonable.'"  *Id.* at 520-21 (citation omitted); *see also Clark v.

25  Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).

26         "Under § 2254(d), a habeas court must determine what arguments or

27  theories supported or, as here, could have supported, the state court's decision;

28  and then it must ask whether it is possible fairminded jurists could disagree that

7

1  those arguments or theories are inconsistent with the holding in a prior decision

2  of this [Supreme] Court." *Richter*, 131 S. Ct. at 786.  "[A] state prisoner must

3  show that the state court's ruling on the claim being presented in federal court

4  was so lacking in justification that there was an error well understood and

5  comprehended in existing law beyond any possibility for fairminded

6  disagreement." *Id.* at 786-87.

7       "Factual determinations by state courts are presumed correct absent clear

8  and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated

9  on the merits in a state court and based on a factual determination will not be

10  overturned on factual grounds unless objectively unreasonable in light of the

11  evidence presented in the state-court proceeding, § 2254(d)(2)."  *Miller-El v.*

12  *Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).

13       In applying these standards, this Court looks to the last reasoned State

14  court decision.  *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006).  To the

15  extent no such reasoned opinion exists, as when a state court rejected a claim

16  without explanation, this Court must conduct an independent review to determine

17  whether the decisions were contrary to, or involved an unreasonable application

18  of, "clearly established" Supreme Court precedent.  *Delgado v. Lewis*, 223 F.3d

19  976, 982 (9th Cir. 2000).  If the state court declined to decide a federal

20  constitutional claim on the merits, this Court must consider that claim under a *de*

21  *novo* standard of review rather than the more deferential "independent review" of

22  unexplained decisions on the merits authorized by *Delgado.  Lewis v. Mayle*, 391

23  F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim

24  state court did not reach on the merits).

25                                **IV.**

26                          **DISCUSSION**

27       The Court of Appeal's opinion was the last reasoned decision under *Davis*

28  for all three grounds.

8

1

**A.   GROUND ONE:  Lesser Included Offense**

2       Petitioner contends that the trial court erred by refusing to instruct the jury

3   on the lesser included offense of misdemeanor false imprisonment.  (LD 3 at 7.)

4   Respondent argues that this ground does not present a federal question.[3]

5   (Answer at 13.)

6       There is no clearly established Supreme Court law requiring the giving of a

7   lesser included offense instruction in noncapital cases.  In *Beck v. Alabama*, 447

8   U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), the Supreme Court held that

9   failure to instruct on a lesser included offense in a capital case would be

10   constitutional error if there is evidence to support the instruction.  *Id.* at 637-38.

11   The Supreme Court left open the question "whether the Due Process Clause

12   would require the giving of such instructions in a noncapital case."  *Id.* at 638

13   n.14; *see Keeble v. United States*, 412 U.S. 205, 213, 93 S. Ct. 1993, 36 L. Ed.

14   2d 844 (1973) (Supreme Court has "never explicitly held that the Due Process

15   Clause of the Fifth Amendment guarantees the right of a defendant to have the

16   jury instructed on a lesser included offense").  When, as here, the Supreme Court

17   expressly reserves an issue, Petitioner cannot show that a state court's decision

18   is contrary to, or an unreasonable application of, clearly established federal law.

19   28 U.S.C. § 2254(d)(1); *see Carey*, 549 U.S. at 77; *Earp v. Ornoski*, 431 F.3d

20   1158, 1185 (9th Cir. 2005).  The Ninth Circuit has acknowledged that "[t]here is

21   no settled rule of law on whether *Beck* applies to noncapital cases."  *Turner v.*

22   *Marshall*, 63 F.3d 807, 819 (9th Cir. 1995), *overruled on other grounds by Tolbert*

23   *v. Page*, 182 F.3d 677 (9th Cir. 1999) (en banc); *Windham v. Merkle*, 163 F.3d

24   1092, 1106 (9th Cir. 1998).

25       Ground One does not warrant habeas relief.

26

27   _____

28       [3] The Court of Appeal also found there is "no federal constitutional right to
instructions on lesser included offenses" in noncapital cases.  (LD 6 at 7.)

9

### B.   GROUND TWO:  Impartial Jury

"The right to an impartial jury is guaranteed by both the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, and by principles of due process." *Turner v. Murray*, 476 U.S. 28, 36 n.9, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986).  "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751 (1961).  "One touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) (citation omitted).

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).  However, "[n]o hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." *Skilling v. United States*, 130 S. Ct. 2896, 2917, 177 L. Ed. 2d 619 (2010).  A trial court has "wide discretion" in conducting *voir dire*, including "deciding what questions should be asked." *Mu'Min v. Virginia*, 500 U.S. 415, 427, 424, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991); *see Skilling*, 130 S. Ct. at 2917 (jury selection is within province of trial judge).  "To be constitutionally compelled, . . . it is not enough that [certain] questions might be helpful.  Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min*, 500 U.S. at 425-26; *see Skilling*, 130 S. Ct. at 2918 n.20.

"Any claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat" on the jury. *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988).  "[P]eremptory challenges are not of constitutional dimension.  They are a means to achieve the end of an impartial jury.  So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory

1   challenge to achieve that result does not mean that the Sixth Amendment was

2   violated." *Id.* at 88 (internal citations omitted).

3       The standard for whether a prospective juror should be excused for cause

4   "is whether the juror's views would prevent or substantially impair the

5   performance of his duties as a juror in accordance with his instructions and his

6   oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841

7   (1985) (footnote and internal quotation marks omitted).  "Deference to the trial

8   court [in an excusal for cause] is appropriate because it is in a position to assess

9   the demeanor of the venire, and of the individuals who compose it, a factor of

10  critical importance in assessing the attitude and qualifications of potential jurors."

11  *Uttecht v. Brown*, 551 U.S. 1, 9, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007).

12  "The requirements of the . . . AEDPA . . ., of course, provide additional, and

13  binding, directions to accord deference."  *Id.* at 10.

14      Jury selection for Petitioner's trial consisted of "a two-step questioning

15  process." (LD 2 at 11.)  The first step required prospective jurors to answer

16  questions listed on a board, including the juror's area of residence; the juror's job;

17  the juror's marital status; if married or in a relationship, the spouse's or significant

18  other's job; whether the juror has children, and, if grown, the child(ren)'s job(s);

19  and any prior jury experience.  (*Id.* at 11-13.)  The trial judge often asked

20  additional clarifying questions of the jurors after they answered the questions on

21  the board.  (*See, e.g., id.* at 61.)

22      The second step required prospective jurors to review a 19-question

23  questionnaire and to explain any "yes" answers to any of the questions.  (*Id.* at

24  14; LD 10.)  After the court's questioning was complete, it then gave counsel a

25  total of 30 minutes each for their follow-up questions.  (LD 2 at 126, 266-67.)[4]

26

27  _____

28      [4] After the court called for a second panel of jurors, it gave counsel an
    additional 10 minutes each for follow-up questions.  (*Id.* at 498.)

1       After multiple complaints by defense counsel (Terry Shenkman) during *voir*

2   *dire* that she had insufficient time for follow-up questions, the trial court ruled:

3       Given how the jury selection has been proceeding to date, the court has

4       made the following determination and is going to issue the following ruling.

5       [¶] The court is going to deem that defense counsel will challenge for cause

6       every juror who is examined based on the court's ruling enforcing its time

7       limitation for attorney *voir dire*. [¶] The court will also in advance announce

8       that it is overruling the challenge on that ground fro the same reason I have

9       already stated numerous times at sidebar. [¶] This means that will not have

10      sidebars on the issue of challenges for cause unless there is some other

11      basis for a challenge for cause other than what I have stated.

12  (*Id.* at 369-70.)

13      Shenkman also requested additional peremptories:

14      SHENKMAN:  [U]nless you wanted us to do it after I used my final

15  peremptory, [I am requesting] 13 additional peremptories because I had to use 13

16  of my peremptories on people that I had requested that the court excuse for

17  cause that were denied, and if the court wants me to, I can go through all of them.

18      COURT:  No, that's not necessary.  I note that there have been a number

19  of challenges for cause.  They have been denied.  There have been a smaller

20  number that have been granted.  There have been a number that have been

21  stipulated to. [¶] We have called into this court 80 jurors; first 55, a second panel

22  of 25.  We're still working our way through the second panel, but we had an

23  enormous number of jurors in this case.  The court is denying the challenges.  I

24  find it to be without any basis given the circumstances and the number of jurors in

25  this case.

26  (*Id.* at 569-70.)

27      Petitioner argues that the trial court erred in three ways:  (1) denying

28  Shenkman's request for additional *voir dire*, (2) denying Shenkman's request for

1    additional peremptory challenges, and (3) refusing to strike several jurors for

2    cause.  (LD 3 at 12-13.)

3    　　　With respect to the alleged inadequacy of the *voir dire* and the denial of the

4    additional peremptory challenges, the Court of Appeal found that the jury

5    questionnaires "adequately probed the prospective jurors' backgrounds and

6    views.  When coupled with the trial court's *voir dire* questioning, there was an

7    adequate basis for the parties to exercise challenges for cause as well as

8    peremptory challenges."  (LD 6 at 14.)

9    　　　The Court of Appeal's conclusion that *voir dire* was adequate was not

10   unreasonable.  *See Mu'Min*, 500 U.S. at 427, 424.  Except for three jurors (LD 3

11   at 27-28),[5] Petitioner does not explain in what way the *voir dire* was inadequate.

12   　　　Petitioner also argues that the trial court erred in denying his challenges for

13   cause for the following jurors who were ultimately seated on the jury:[6]  Juror No. 2

14   (Prospective Juror No. 7426); Juror No. 3 (Prospective Juror No. 4304); Juror No.

15   5 (Prospective Juror No. 0204); Juror No. 10 (Prospective Juror No. 1247); and

16   Juror No. 11 (Prospective Juror No. 8859).  (Reply at 3.)  Petitioner argues that

17   the trial court erred in not granting additional peremptory challenges to the extent

18   ///

19   ///

20   ///

21   ///

22

23   　　　　　[5]  The Court addresses the three jurors below.

24   　　　　　[6]  Petitioner also contends that the trial court should not have denied the
25   challenges for cause for seven other jurors.  (LD 3 at 15.)  The Court of Appeal
     rejected this contention because Petitioner exercised peremptory challenges for
26   the seven.  (LD 6 at 9); *Skilling*, 130 S. Ct. at 2923 n.31 ("'[I]f [a] defendant elects
     to cure [a trial judge's erroneous for-cause ruling] by exercising a peremptory
27   challenge, and is subsequently convicted by a jury on which no biased juror sat,'
     we have held, 'he has not been deprived of any . . . constitutional right.'") (citation
28   omitted); *Ross*, 487 U.S. at 86, 88.  Petitioner does not question the state court's
     factual finding.  (Reply at 3.)

1   necessary to strike these jurors who were unsuccessfully challenged for cause.[7]

2   (LD 3 at 23.)

3           **1.    Juror No. 2 (3426)**

4        Juror No. 2 was a quality insurance inspector in the aircraft industry.  (LD 2

5   at 380-81.)  He was married to an office manager in the retail food preparation

6   business.  (*Id.* at 381.)  He had three grown children, one an administration

7   assistant at a hospital, and the other two aircraft power point mechanics.  (*Id.*)

8   Juror No. 2 had served on two criminal juries, one involving armed robbery, and

9   the other a "burglary" where the perpetrator broke into a home and held the victim

10  at gunpoint until the police showed up.  (*Id.* at 383.)

11       Juror No. 2 answered "yes" to Question No. 5, which asks, "Do you or your

12  spouse belong to any neighborhood or other organization that supports police or

13  police activity."  (LD 2 at 381; LD 10.)  He volunteered his time to disaster

14  communications at the Sheriff's Department.  (*Id.* at 382.)  In the event of a

15  disaster, Juror No. 2 served as a "go-between" for the various agencies (fire,

16  police, sheriff).  (*Id.* at 382.)  The judge asked Juror No. 2 if there was "anything

17  about that contact you have with different law enforcement organizations in that

18  volunteer position that you think would make you tend to favor one side or the

19  other in a criminal case," and Juror No. 2 said "no."  (*Id.*)

20       Juror No. 2 also answered "yes" to Question No. 11, which asks, "Have you

21  or any close friend or relative had any experience with the court system that was

22  either so positive or so negative that you would be unable to serve as a fair and

23

24        [7]  "[T]here is no freestanding constitutional right to peremptory challenges."

25  *Rivera v. Illinois,* 129 S. Ct. 1446, 1453, 173 L. Ed. 2d 320 (2009).  "Because
    peremptory challenges are within the States' province to grant or withhold, the

26  mistaken denial of a state-provided peremptory challenge does not, without more,
    violate the Federal Constitution."  *Id.* at 1454.  When, as here, no member of the

27  jury as finally composed was removable for cause, denial of a peremptory does
    not violate the federal constitution.  *Id.; United States v. Lindsay,* 634 F.3d 541,

28  548-50 (9th Cir. 2011) (following *Rivera*).  Thus, Petitioner's argument regarding
    peremptory challenges falls with the juror bias claim.

1  impartial juror in this case (including traffic tickets)?"  (LD 2 at 384; LD 10.)  About

2  30 years earlier, Juror No. 2 had been arrested for street racing.  (*Id.* at 384.)  He

3  appeared in juvenile court with his parents, admitted the charge, and was

4  sentenced to 150 hours of community service and fines.  (*Id.* at 385.)  After

5  questioning by the judge, Juror No. 2 said that his experience didn't really fit into

6  Question No. 11 because it would not affect his ability to be a fair juror.  (*Id.* at

7  385-86.)

8      Juror No. 2 had no more "yes" answers to the questionnaire.  (*Id.* at 386.)

9      Petitioner argues that "the trial court failed to ask sufficient questions to

10  discern the state of mind" of Juror No. 2.  (LD 3 at 27.)  The Court of Appeal

11  concluded that the questioning was adequate.  (LD 6 at 13-14.)

12      Petitioner has failed to allege any specific questions that should have been

13  asked of Juror No. 2.  His argument that the questioning was inadequate is

14  conclusory.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory

15  allegations which are not supported by a statement of specific facts do not

16  warrant habeas relief.").  In his Reply, he argues that Juror No. 2 should have

17  been excused for cause because of "the close relationships to law enforcement."

18  (Reply at 3.)  There is no showing of a close relationship.  Moreover, Juror No. 2

19  stated that his volunteer disaster work would not make him favor one side or the

20  other.  (LD 2 at 382); *see also Skilling*, 130 S. Ct. at 2924 (juror who responded

21  that greed triggered Enron's bankruptcy and corporate executives "'walk a line

22  that stretches sometimes the legality of something'" credibly asserted he could be

23  impartial); *Id.* at 2918 ("Reviewing courts are properly resistant to second-

24  guessing the trial judge's estimation of a juror's impartiality, for that judge's

25  appraisal is ordinarily influenced by a host of factors impossible to capture fully in

26  the record – among them, the prospective juror's inflection, sincerity, demeanor,

27  candor, body language, and apprehension of duty.").

28

## 2.    Juror No. 3 (4304)

Juror No. 3 was an actor/comedian.  (LD 2 at 445.)  He was divorced, his ex-wife was in real estate, and he had no children or prior jury experience.  (*Id.*)

He answered "yes" to Question No. 4, which asks, "Would the fact that a witness was a member of a law enforcement agency cause you to tend to automatically believe or disbelieve that witness' testimony, simply because s/he was a law enforcement officer?"  (LD 2 at 445; LD 10.)  He also answered "yes" to Question No. 3, which asks, "Do you have any close friends or relatives who are or have been employed by a law enforcement agency?"  (*Id.*)

Juror No. 3 had two cousins who were police chiefs and one cousin/best friend who was a detective.  (LD 2 at 445.)  The detective worked in Seattle, one chief worked in Idaho, and the other worked in Holland.  (*Id.* at 445-46.)  Juror No. 3 also had a cousin who was a deputy sheriff in Los Angeles and another best friend and business partner who was a lieutenant in the sheriff's department reserves.  (*Id.* at 446.)  He said he was close to all of these friends and relatives, except he did not see the one in Holland very often.  (*Id.* at 447.)

The judge asked him why he would automatically believe law enforcement, and Juror No. 3 said "it's the way I was brought up."  (*Id.* at 448.)

COURT:  Would you be able in this case – I understand your instinct, but in this case would you be able to evaluate each witness using the same factors, understanding that's what a juror is supposed to do?  Would you be able to do that?

JUROR NO. 3:  I would do my best to try to do that.

COURT:  Nobody comes into the courtroom either automatically believable or unbelievable?

JUROR NO. 3:  Yes.

COURT:  I mean, the rule is each witness comes in where the jury are supposed to evaluate them individually. [¶] Similarly, if a defense witness

16

1   testifies, you couldn't say, well, that person is a defense witness, therefore, they

2   are automatically unbelievable.  That would be equally unfair and a violation of

3   the rules.

4   　　　　JUROR NO. 3:  Right.

5   　　　　COURT:  Would you be able to follow the rules as I explained them?

6   　　　　JUROR NO. 3:  Yes.

7   (*Id.* at 450-51.)

8   　　　　Juror No. 3 had no more "yes" answers to any of the questions on the

9   questionnaire.  (*Id.* at 451.)

10   　　　　Petitioner again argues that Juror No. 3 had too close a relationship to law

11   enforcement.  (Reply at 3.)  The Court of Appeal rejected the challenge to Juror

12   No. 3 because he "expressly stated he would follow the trial court's instructions."

13   　　　　Again, Juror No. 3 stated he was able to judge each witness as an

14   individual.[8]  *See Skilling*, 130 S. Ct. at 2924.  In addition, the trial court was better

15   able to assess Juror No. 3's credibility than this Court, which must accord

16   deference to the trial court's findings that Juror No. 3 would make an impartial

17   juror.  *See Uttecht*, 127 S. Ct. at 2224.

18   　　　　　　**3.　　Juror No. 5 (0204)**

19   　　　　Juror No. 5 was a packaging engineer/designer, and was married with a

20   baby daughter.  (LD 2 at 413.)  His wife had worked as a CPA but was now a

21   stay-at-home mother.  (*Id.* at 413-14.)  He had no prior jury experience and no

22   "yes" answers to any of the questions on the questionnaire.  (*Id.* at 414.)  He

23   stated he would be able to follow the judge's rules about presumption of

24   innocence and the prosecution's burden of proof.  (*Id.*)

25

26   　　　　[8]  Petitioner's contention that Juror No. 3 "never recanted" his initial position

27   that he would "most likely" "believe a police officer regardless of what they said or
how they said it" is incorrect.  (LD 3 at 24 (quoting LD 2 at 448).)  At the end of
the trial judge's questioning, Juror No. 3 clearly stated that he would be able to

28   set aside his feelings and judge each witness as an individual.  (LD 2 at 450-51.)

1    Similar to Juror No. 2, Petitioner argues that "the trial court failed to ask
2  sufficient questions to discern the state of mind" of Juror No. 5.  (LD 3 at 27.)  The
3  Court of Appeal concluded the questioning was adequate.  (LD 6 at 13-14.)

4    Petitioner has failed to allege any specific questions that should have been
5  asked of Juror No. 5.  His argument that the questioning was inadequate is
6  conclusory.  *See James*, 24 F.3d at 26.  His argument that Juror No. 5 should
7  have been excused for cause because of his "close relationships to law
8  enforcement" is rejected.  Juror No. 5 did not say he had any relationships with
9  law enforcement.  (Reply at 3.)

10               **4.    Juror No. 10 (1247)**

11   Juror No. 10 was a clinical dietician who was engaged to a computer
12  programmer.  (LD 2 at 306.)  She had no children.  She had two prior jury
13  experiences on cases involving a battery on a police officer and drug possession
14  with intent to sell.  (*Id.* at 306-07.)  She had no "yes" answers to the questions on
15  the questionnaire.  (*Id.* at 308.)  She stated she would be able to follow the
16  judge's rules about presumption of innocence and the prosecution's burden of
17  proof.  (*Id.*)  She said she felt she could be fair to both sides.  (*Id.*)

18    Similar to Jurors Nos. 2 and 5, Petitioner argues that "the trial court failed
19  to ask sufficient questions to discern the state of mind" of Juror No. 10.  (LD 3 at
20  27.)  The Court of Appeal concluded the questioning was adequate.  (LD 6 at 13-
21  14.)

22    Petitioner has failed to allege any specific questions that should have been
23  asked of Juror No. 10.  His argument that the questioning was inadequate is
24  conclusory.  *See James*, 24 F.3d at 26.  His argument that Juror No. 10 should
25  have been excused for cause because of "the close relationships to law
26  enforcement" is rejected.  Juror No. 10 did not say she had any relationships with
27  law enforcement.  (Reply at 3.)

28

### 5.    Juror No. 11 (8859)

Juror No. 11 was a forensic specialist for the City of Glendale.  (LD 2 at 559.)  She was single, no children, and had no jury experience.  (*Id.*)  Juror No. 11's work involved going to crime scenes to "do photography, collection of evidence, fingerprint examination, trace evidence, videotaping and sketching documentation" of the scene.  (*Id.* at 560.)  She did not analyze the evidence, she collected it.  (*Id.*)  She had testified in over 100 cases.  (*Id.* at 561.)  She worked on a variety of different kinds of cases, and on more than one occasion had worked on cases similar to Petitioner's.  (*Id.*)

The judge asked if her work would make it more difficult for her to be impartial, and she said "no."  (*Id.* at 562.)  However, she said it would be harder for her not to apply her knowledge to what she heard in Petitioner's case.[9]  (*Id.*)  When the judge asked if she could "limit [her] consideration of the case to what [she heard] in the courtroom," she said she had "a little bit of hesitation saying I could absolutely say that it wouldn't influence me."  (*Id.* at 562-63.)  The judge then asked her that if she were selected as a juror and found she was "unable to limit yourself to the evidence presented, would you be able to let us know that."  (*Id.* at 563.)  She said "yes."  (*Id.*)  She also said she would not share any of her "specialized" knowledge with other jurors.  (*Id.*)

When Shenkman asked Juror No. 11 whether her work experience "would compromise your ability to be impartial," Juror No. 11 said:  "As long as I could separate it and not overthink something in my own role specifically when I am hearing information.  So if I had to say, I might not be able to be impartial then in that realm."  (*Id.* at 564-65; LD 6 at 13.)  The prosecutor followed up on this line and asked whether Juror No. 11 "would favor one side over the other," and Juror

---

[9]  In California, a juror with specialized knowledge is not prohibited from using that knowledge to interpret the evidence.  *People v. Steele*, 27 Cal. 4th 1230, 1266, 120 Cal. Rptr. 2d 432 (2007).

1    No. 11 said "no." (*Id.* at 565.)  Juror No. 11 reiterated that her only concern was

2    that she might "go outside the realm of what I am supposed to be just focusing on

3    the information only that I am given in the courtroom." (*Id.* at 566.)

4         In a sidebar with counsel, the judge noted that Juror No. 11 said she could

5    follow the court's instructions and noted that she "had a concern.  She said it

6    would be difficult.  That doesn't mean she can't do it, and she did say she could

7    do it." (*Id.* at 568-69.)

8         The Court of Appeal found that the trial court did not abuse its discretion in

9    denying the defense's challenge for cause.  (LD 6 at 13.)

10        Petitioner's argument that Juror No. 11 "freely acknowledged that she

11   would not assess law enforcement witnesses impartially" distorts the record.  (LD

12   3 at 26.)  Juror No. 11 made it clear that her only concern was bringing her own

13   expertise to bear on the evidence, not any bias in favor of law enforcement.[10]

14              **6.    Conclusion**

15        The state court's decision was not contrary to United States Supreme

16   Court precedent, nor were its factual findings unreasonable.  The trial court's

17   refusal to allow additional questions did not render Petitioner's trial fundamentally

18   unfair.  *Mu'Min*, 500 U.S. at 425-26.  The trial court did not seat any juror whose

19   "views would prevent or substantially impair the performance of his duties as a

20   juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at

21   424.  Ground Two does not warrant habeas relief.

22        **C.    GROUND THREE:  <u>Prosecutorial Misconduct</u>**

23        "The relevant question is whether the prosecutors' comments 'so infected

24   the trial with unfairness as to make the resulting conviction a denial of due

25   process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed.

26

27        [10]  Petitioner's argument that the trial court erred by asking Juror No. 11 to

28   inform the court if her "use of specialized knowledge was affecting her evaluation
     of the evidence" is without citation to any legal authority.

1   2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868,

2   40 L. Ed. 2d 431 (1974)).  Determining whether prosecutorial misconduct

3   occurred during closing argument requires an examination of the entire

4   proceedings so the prosecutor's remarks may be placed in proper context.

5   *Boyde v. California*, 494 U.S. 370, 384-85, 110 S. Ct. 1190, 108 L. Ed. 2d 316

6   (1990).  "Inappropriate prosecutorial comments . . . must be examined within the

7   context of the trial to determine whether the prosecutor's behavior amounted to

8   prejudicial error."  *United States v. Young*, 470 U.S. 1, 11-12, 105 S. Ct. 1038,  84

9   L. Ed. 2d 1 (1985).  A court "must consider the probable effect the prosecutor's

10  response would have on the jury's ability to judge the evidence fairly."  "[T]he

11  issue is not the prosecutor's license to make otherwise improper arguments, but

12  whether the prosecutor's 'invited response,' taken in context unfairly prejudiced

13  the defendant."  *Id.* at 12.  "[I[f the prosecutor's remarks were 'invited,' and did no

14  more than respond substantially in order to 'right the scale,' such comments

15  would not warrant reversing a conviction."  *Id.* at 12-13 (footnote omitted).

16          Prosecutorial misconduct is subject to harmless error analysis.  *Brecht v.*

17  *Abrahamson*, 507 U.S. 619, 638, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (error

18  is harmless unless it had "substantial and injurious effect or influence in

19  determining the jury's verdict").

20          Petitioner argues three categories of improper closing argument by the

21  prosecutor:  improper attacks on defense counsel, improper appeals to sympathy

22  for the victim, and improper requests to ignore the presumption of innocence.

23  (LD 3 at 29.)

24                    **1.    Attacks on Defense Counsel**

25  The prosecutor made the following statements during her final summation:

26  My job is to present the evidence to you.  The defense's job is to tell you

27

28

21

1  that we have not proven our case no matter what the evidence is.[11]

2  * * *

3  If Julie Lister had walked in here and said, "There was an injury and I think

4  it was caused by the defendant putting his fingers on her genitals," then the

5  defense would be arguing, "Well, isn't it true that injuries are actually

6  inconsistent with genital penetration."

7  * * *

8  Defense would be arguing that you don't find injuries in cases such as

9  these and, therefore, it didn't happen.  No matter what the result, they

10  would have said that it didn't happen.

11  (LD 2 at 1132, 1139.)

12  Petitioner argues that the prosecutor "insinuated that defense counsel

13  would argue the opposite was true regardless of the evidence presented by the

14  People – that is, that the defense would attempt in its case to mislead the jury

15  about the truth."  (LD 3 at 31.)

16  The Court of Appeal concluded that it is not misconduct for a prosecutor to

17  ask the jury to believe the prosecution's version of events based on the evidence.

18  (LD 6 at 18.)  The court found the prosecutor did not attack defense counsel

19  personally, but rather attacked her argument.  (*Id.* at 19.)

20  The state court's decision was not contrary to, or an unreasonable

21  application of, clearly established federal law and was not an unreasonable

22  determination of the facts.  For example, as the Court of Appeal noted, the

23  prosecutor was responding to defense counsel's argument that lack of genital

24  trauma was inconsistent with the victim's testimony that Petitioner's three fingers

25  went into her vagina.  (LD 6 at 17.)  The prosecutor cited Lister's testimony that

26  she could remember only one case in which she saw trauma from digital

27  _____

28  [11]  The trial court sustained defense counsel's objection to this statement.
(LD 2 at 1132.)

1   penetration out of about 4,000 sexual assault examinations. (*Id.*)  The prosecutor

2   then stated that, based on common sense, "you wouldn't expect to see an injury

3   in this type of case." (*Id.* at 18.)  In that context, the prosecutor argued that had

4   Lister testified there was injury from digital penetration, the defense would have

5   argued that injury was inconsistent with digital penetration. (*Id.*)  The reasonable

6   import of the prosecutor's argument was that the jury should accept the

7   prosecution's version of events.  The prosecutor's argument did not so infect the

8   trial with unfairness as to make the conviction a denial of due process.

9   *Wainwright*, 477 U.S. at 181.

10                    **2.       Sympathy for the Victim**

11        In summation, the prosecutor argued:

12        When [R.G.] walked into that bathroom that afternoon, she felt safe.  She

13        was at school.  Why wouldn't she feel safe?  It was 4:00 in the afternoon.

14        There were adults and children around.  She didn't have a care in the

15        world.  She didn't even make sure to lock the door to the bathroom.  That's

16        how safe [R.G.] felt. [¶]  But when that stranger sitting right over there

17        walked into that bathroom and he told her to shut up and he covered her

18        mouth when she screamed and he smashed her head against the door

19        when she tried to get out and when [R.G.] realized that she was trapped

20        and that she had no choice but to back up into that corner and allow this

21        stranger to put his hands on her, this feeling of safety was gone.  It was

22        probably gone forever. [¶] How can [R.G.] feel completely safe again? * * *

23        [¶] So, Ladies and Gentlemen, when counsel gets up here and tells you, as

24        I suspect she will, that this case is about D.N.A. and insignificant –

25        insignificant details that may have been forgotten or confused by an 11-

26        year-old child, I want you to remember what this case is really about.  It's

27        about an 11-year-old girl whose body and freedom were violated that day

28

1    and whose sense of security was destroyed, and I want you to keep that in

2    mind no matter what we say during these arguments.

3  (LD 2 at 1080-81.)

4    In her rebuttal argument, the prosecutor stated:

5    I think it's time that we put this nightmare to rest for [R.G.], and the only

6    way you can do that is by making sure that the person who did this to her is

7    held accountable.

8  (*Id.* at 1152.)

9    Petitioner argues that these remarks "urged the jury, in assessing

10  [Petitioner's] guilt, to disregard the forensic evidence, the prior inconsistent

11  evidence, and the internally inconsistent evidence, and focus instead on its

12  sympathy for [R.G.]'s plight."  (LD 3 at 33.)

13    The Court of Appeal found that the prosecutor's last remark was invited by

14  defense counsel's following argument:

15    So instead of admitting [R.G.]'s caught in a lie – and the evidence tells us

16    that, the lack of trauma and the lack of D.N.A. – what she tells us is – to get

17    sympathy is "I am confused," and she tell us that "I have nightmares," and

18    that was just a manipulative attempt on her part to get sympathy because

19    perhaps she's embarrassed about the lie she told.

20  (LD 2 at 1125; LD 6 at 20.)  In addition, the Court of Appeal found that R.G. had

21  testified as to her nightmares and fears.  (LD 6 at 20.)

22          **3.**    **Presumption of Innocence**

23    During her final summation, the prosecutor stated:

24    Now, I ask you when you come into this courtroom, you have to presume

25    the defendant innocent.  When you are out in your daily lives, do you think

26    anyone would presume that a  man who was locked in a bathroom with a

27    young girl who was screaming . . . was not doing anything in there?

28  (LD 2 at 1136.)

24

1    Petitioner argues that the prosecutor's argument indicated that jurors would

2    be "foolish" to apply a presumption of innocence in the "real world," "and by

3    implication, foolish to apply it in their deliberations." (LD 3 at 33.)

4    The Court of Appeal found that the prosecutor's statements were invited by

5    defense counsel's argument that R.G. made the whole thing up and that "[t]he

6    prosecutor could properly comment on Ms. Shenkman's argument and propose it

7    was based on an unreasonable interpretation of what occurred." (LD 6 at 21.)  A

8    prosecutor may argue reasonable inferences from the evidence. *Young*, 470

9    U.S. at 8; *Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005).

10                          **4.    Prejudice**

11    The Court of Appeal found that to the extent any of the prosecutor's

12    argument was "inappropriate," it was harmless. (LD 6 at 21.)  The jury was

13    instructed that argument was not evidence. (*Id.*)  The jury hung on the sexual

14    assault and lewd act counts.[12]  (*Id.*)

15    The state court's decision was not contrary to, or an unreasonable

16    application of, clearly established federal law and was not an unreasonable

17    determination of the facts. *See Brecht*, 507 U.S. at 638 (an error is harmless

18    unless it had "substantial and injurious effect or influence in determining the jury's

19    verdict"). Petitioner was found guilty only of Count 3 (felony false imprisonment),

20    the least serious of the three charged offenses,[13] and one that required no proof

21    of sexual misconduct.  There is no evidence the jury responded to any purported

22    solicitation of sympathy for the victim by the prosecutor or failed to apply the

23    presumption of innocence.  Finally, the jury was able to evaluate the evidence

24

25          [12]  The Court of Appeal's statement that the jury acquitted Petitioner of
26    these two counts is incorrect.  (LD 6 at 21; LD 2 at 1168.)

27          [13]  The possible sentence for a conviction on Count 1 was 15 years to life.
     (LD 1 at 23.)  The possible sentence for  Count 2 was a range of 3 to 8 years.
28    (*Id.*)  By contrast, the possible sentence for Count 3 was a range of 16 months to
     3 years.  (*Id.*)

1   fairly despite any purported indications by the prosecutor that the defense wanted

2   them to ignore evidence.  *See Young*, 470 U.S. at 12.  Ground Three does not

3   warrant habeas relief.

**V.**

**RECOMMENDATION**

6       For the reasons discussed above, it is recommended that the District Court

7   issue an Order (1) adopting this Report and Recommendation; and (2) denying

8   the petition with prejudice.

10  DATED: July 1, 2011

_____
                    ALICIA G. ROSENBERG
                    United States Magistrate Judge